IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

v.                                No. 2:10-cr-20317-SHM-cgc

**KENNETH PATTERSON, SR.,**

        **Defendant.**

---

**REPORT AND RECOMMENDATION
ON DEFENDANT'S MOTION TO SUPPRESS**

---

Before the Court is Defendant Kenneth Patterson, Sr.'s ("Defendant") Motion to Suppress. (Docket Entry "D.E." #23). The instant motion was referred to United States Magistrate Judge Charmiane G. Claxton for Report and Recommendation. (D.E. #32). The Court held a hearing on October 26, 2011, after which the parties submitted closing briefs addressing the issues raised in the instant motion. For the reasons set forth herein, the Court RECOMMENDS that Defendant's Motion to Suppress be DENIED.

**I. Proposed Findings of Fact**

On May 14, 2007, Defendant was released from prison on parole. (D.E. # 48, Oct. 26, 2011 H'rg. Tr. ("Tr.") at 23-24). Defendant, as a condition of his parole, signed a "Parole Certificate," which contained several conditions he must agree to and sign to be released on parole. (Tr. at 25-26). One of the conditions that Defendant agreed to stated, "I agree to a search, without a warrant, of my person, vehicle, property, or place of residence by any probation/parole officer or

1

law enforcement officer, at any time." (Tr. at Exh. 1). The Defendant was on parole from May 14, 2007 until "sometime" in 2013. (Tr. at 29). Therefore, on July 1, 2009—the date of the events at issue in this motion— the Defendant was still bound by the terms of his Parole Certificate. (Tr. at 29).

On July 1, 2009, Memphis Police Department officers Dressels Fox ("Officer Fox") and Kevin Williams ("Officer Williams") were undercover investigating a drug complaint at 3071 Parker, in Memphis, Tennessee. (Tr. at 41, 86, 101). Officer Williams had received two complaints, one on that date and one a couple of weeks before, that an individual known as "KP" was selling drugs from the 3071 Parker address. (Tr. at 86). After conducting a search through the utility company, Officer Williams learned that Defendant lived at 3071 Parker. (Tr. at 87, 101). Officer Williams knew of Defendant already because he had previously arrested him. (Tr. at 101). Officer Williams believed that the Defendant was currently out on parole and relayed that information to Officer Fox. (Tr. at 102).

Officer Williams proceeded to drive by Defendant's house, at which point he observed several Caucasian males, one of whom was a known user of crack cocaine, on the street outside 3071 Parker. (Tr. at 88-89). Officer Williams alerted Officer Fox and other units to let them know of the activity taking place. (Tr. at 88-89). Officer Fox then came to the scene and set up surveillance on the house. (Tr. at 90). The officers observed a female, later identified as Freddie Ball ("Ball"), leave Defendant's residence, and Officer Williams notified a uniformed patrol officer, who initiated a traffic stop of Ball. (Tr. at 47, 91-92). Officer Fox went to the location of the stop and spoke with Ball, where she agreed to go back to Defendant's house to assist officers with a "knock and talk." (Tr. at 47, 49, 93).

2

Officer Fox rode with Ball back to the Defendant's residence where he instructed Ball to knock on the door while he stood out of view on the side of the house. (Tr. at 48-49). Officer Williams observed the scene from his surveillance post. (Tr. at 93, 102). Officer Fox testified that, when Defendant opened the door, he heard him say, "you're back again, you just left." (Tr. at 53). Officer Fox then approached the door and identified himself as a Memphis Police Officer, and he observed on the floor in the "immediate area between the opening of the wooden door and the storm door was a piece of what appeared to be crack rock." (Tr. at 56). Additionally, Officer Fox observed what appeared to be crack rock in and around a brown bag on the living room table and a male "suddenly run to the back of the house." (Tr. at 60-61). Officer Fox whispered to Officer Williams through his earpiece bluetooth to have other officers and cars come to the location. (Tr. at 61, 93, 95).

Officer Fox waited until the other officers pulled up to the house before making entry into the home. (Tr. at 61). Upon entering the house, Officer Fox observed several people in the house on the floor and sitting in chairs. (Tr. at 62, 76). The officers initially went to the back of the house to talk to the male who ran for fear that "he was attempting to destroy drugs or evidence or obtain a firearm." (Tr. at 76). Officer Fox testified that he feared both that the officers' safety was at stake and that evidence might be destroyed. (Tr. at 76). The officers brought the male who had attempted to flee back to the front of the house and then ordered everyone to get onto the ground. (Tr. at 63-64). Officer Williams, who had been outside up until this point, came into the residence to assist. (Tr. at 96). Officer Williams asked Defendant to get off the floor and presented him with a consent-to-search form. (Tr. at 96).

Officer Williams informed Defendant that the officers were there because of the complaints that he was selling drugs out of the house. (Tr. at 99). Officer Williams testified that

he asked Defendant for permission to search the house, and Defendant replied, "you can search the house, I'm on parole, I mean, I can't stop you from searching anyway." (Tr. at 99). Defendant then signed the consent to search form. (Tr. at 99). The officers proceeded to search the residence, during which they located a brown sandwich bag underneath Defendant's bed pillow containing two large rocks of crack cocaine and one bag of powder cocaine. (Tr. at 81, 105-106; Exhibit 2 at 2). Additionally, the search of Defendant's bedroom revealed one black leather bag containing the Defendant's mail and a utilities bill next to Defendant's bed where the crack cocaine was found. (Tr. at 81,106; Exhibit 2 at 2). Officers also seized the crack cocaine that Officer Fox had initially observed from the porch, which amounted to one rock of cocaine from the living room floor and one brown plastic bag containing sixty-eight rocks of crack cocaine on the living room table. (Tr. at 55-56, 60, 72-75, 80, 106, Exhibit 2 at 2). Officers also located a firearm and $258.00 in cash in Defendant's pant pocket. (Tr. at 106, Exhibit 2 at 2).

## II. Proposed Conclusions of Law

The Defendant moves this Court to suppress any and all physical evidence tangible or intangible; any statements or admissions alleged to have been made by the Defendant; any and all observations of law enforcement officers; and, any other tangible or intangible evidence obtained during or as a direct or indirect result from the search of the Defendant's residence. (Def's Mot. to Suppress at 2). The issues presented in the instant motion are (1) whether the crack cocaine initially observed by Officer Fox from the porch of the residence was properly seized under the plain view doctrine; (2) whether the warrantless entry into the home was justified by the exigent circumstances exception to the warrant requirement; (3) whether the search of Defendant's residence was lawful due to his reduced expectation of privacy as a parolee and due to his voluntary consent to search; and, (4) whether, if any illegalities occurred, any evidence should be

suppressed as fruit of the poisonous tree.

**A. Search and Discovery of Crack Cocaine in Plain View**

First, Defendant requests that this Court suppress the evidence discovered in his home before Defendant's consent to search was obtained. Specifically, Defendant states that the Court should find the seizure of the crack cocaine that Officer Fox initially observed from the front porch was unlawful. The United States argues that the evidence was lawfully seized pursuant to the plain-view doctrine.

A well-delineated exception to the warrant requirement is that law enforcement officers may seize evidence of a crime that is in "plain view." See Horton v. California, 496 U.S. 128, 133-34 (1990); Coolidge v. New Hampshire, 403 U.S. 443 (1971). An "essential predicate" is that "the officer did not violate the Fourth Amendment in arriving at the place from which the evidence would be plainly viewed." Horton, 496 U.S. at 136. Additionally, the incriminating character of the evidence must be immediately apparent and the officer must be lawfully located in a place from which the object can be plainly seen. Horton, 496 U.S. at 136-37 (citations omitted).

In the instant case, Officer Fox was lawfully at the Defendant's front door talking with him when he made several observations of crack cocaine on the floor and on the living room table. (Tr. at 55-56, 60, 72-75, 80). Officer Fox testified that he identified himself as a Memphis Police Officer to Defendant and that he remained on the porch during the time when he saw the evidence in the home. (Tr. at 56). Officer Fox testified that, from his prior training and experience in drug investigations, he is familiar with the appearance of crack cocaine and that, upon seeing the evidence from the porch, it appeared to be crack cocaine. (Tr. at 58-59). Officer Fox's testimony regarding his observations is consistent with the information on the consent-to-search form, which stated that the crack cocaine was visible from the porch on the floor and on the living room table

prior to consent to search the home was obtained. (Exhibit 2 at 2). Furthermore, there is no evidence in the record that contradicts this finding.

Accordingly, the Court recommends that the discovery of the crack cocaine on the living room floor and on the living room table near the front door should not be suppressed because they were discovered in plain view by Officer Fox.

### B. Warrantless Entry of the Officers Due to Exigent Circumstances

Next, Defendant requests that this Court suppress the evidence discovered in his home because the officers entered his residence without a warrant. The United States argues that the entry was lawful pursuant to the exigent circumstances exception to the warrant requirement.

In the Sixth Circuit, there are four categories to support a warrantless entry of a residence under "exigent circumstances": (1) hot pursuit of a fleeing felon; (2) imminent destruction of evidence; (3) prevention of a suspect's escape; and (4) a risk of danger to police or others. United States v. Johnson, 22 F.3d 674, 680 (6th Cir. 2001). Officers must have a reasonable belief that third parties are inside the dwelling and officers must have reason to believe that the loss or destruction of evidence is "imminent." United States v. Sangineto-Miranda, 859 F.2d 1501, 1512 (6th Cir. 1998). In Sangineto-Miranda, the Court held that police had an objectively reasonable belief that the destruction of narcotics was imminent after observing two kilograms of cocaine in the apartment. Id. at 1506. The Court stated, "since the police had an objectively reasonable belief that the destruction of narcotics was imminent, they were justified in entering the . . . apartment without a warrant for the limited purpose of 'securing' the premises and preventing the loss or destruction of evidence." Id. at 1513.

In this case, there is no testimony that contradicts Officer Fox's belief that third parties were inside the home was reasonable. Officer Fox observed several third parties scattered

6

throughout the living room before entering the home. (Tr. at 62, 76). Additionally, Officer Fox observed a male run to the back of the home. (Tr. at 76). Therefore, the warrantless entry based on exigent circumstances turns on whether Officer Fox's belief that the loss or destruction of evidence was imminent.

Here, Officer Fox had already observed crack cocaine in the residence. (Tr. at 55-56, 58-60, 72-73). Thus, it was reasonable for him to believe that the loss or destruction of more drugs and evidence was imminent when the male suddenly ran to the back of the home. Similar to the officers in Sangineto-Miranda, officers entered the residence for the limited purpose of securing the premises and preventing the loss or destruction of evidence. To accomplish this, they ordered everyone to the ground and brought the male who fled back to the front of the house. (Tr. at 64, 76). Both Officer Fox's testimony and the consent-to-search form indicate that no search took place until Defendant's status as a parolee and his consent to search were obtained. (Exhibit 2 at 2; Tr. at 68-69). Therefore, the Court recommends that the officers' warrantless entry into the home was justified by exigent circumstances.

**C. Search of the Defendant's Home based on his Parolee Status and his Consent**

Third, Defendant contends that the search of his residence was unlawful. The United States argues that Defendant has a reduced expectation of privacy as a parolee, and as such, had already consented to the search of his residence in his Parole Certificate. The United States further argues that Defendant provided his written consent before the search took place.

The Fourth Amendment guarantees the "right of people to be secure in their persons, house, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. Courts must examine the "totality of the circumstances" to determine whether a search is reasonable under the Fourth Amendment. United States v. Knight, 534 U.S. 112, 118 (2001).

The question here is one of reasonableness, as the warrant and probable cause requirements generally do not apply to searches of parolees, probationers, or their residences. Samson v. California, 547 U.S. 843, 857 (2006) (permitting suspicionless searches of parolees). The reasonableness of a search is determined "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and, on the other, the degree to which it is needed for the promotion of legitimate government interest." Knight, 534 U.S. at 118-119.

In Knight, the Court, employing "ordinary Fourth Amendment analysis that considers all the circumstances of a search," held that a warrantless search based on a reasonable suspicion of a probationer's home where the conditions of the probation required the probationer to submit to a search at any time, with or without warrant or reasonable cause, was reasonable and not a violation of the defendant's Fourth Amendment rights. Id. at 122. Balancing the probationer's diminished expectation of privacy with the government's interests in preventing recidivism, reintegrating probationers into the community; and reducing crime, the Court found that the search was reasonable. Id. at 121. Additionally, in Samson, the Court concluded that the defendant did not have an expectation of privacy that society would recognize as legitimate when they weighed the plain terms of the parolee's search conditions against the government's interest in supervising parolees. 547 U.S. at 852.

In this case, the officers were aware of Defendant's parolee status at the time they conducted the initial surveillance of the area. (Tr. at 40-44, 71, 85-87). They were further made aware of his status when he announced it before they obtained his consent to search. replied, "you can search the house, I'm on parole, I mean, I can't stop you from searching anyway." (Tr. at 99).

The consequences of Defendant's parole were clearly delineated. Defendant's Parole

Certificate states, "I agree to a search, without a warrant, of my person, vehicle, property, or place of residence by any Probation/Parole officer or law enforcement officer, at any time." (Exhibit 1 at 1). Defendant had agreed to this diminution of his expectation of privacy as a benefit of obtaining parole.

Similar to the defendants in <u>Samson</u> and <u>Knight</u>, the Defendant explicitly agreed to allow any law enforcement officer, at any time, to search his person, vehicle, property, or place of residence, without a warrant. In <u>Samson</u> and <u>Knight</u>, the Supreme Court held that suspicionless searches of parolees were reasonable and do not violate the Fourth Amendment because of the government's interest in supervising parolees. In this case, the Defendant enjoyed a diminished expectation of privacy and consented to a suspicionless search of his residence at any time as a condition of his parole. (Exhibit 1 at 1). Therefore, the Court recommends that the search was reasonable and did not violate the Defendant's Fourth Amendment rights.

Even if the Defendant had not consented to a search of his residence in his Parole Certificate, Defendant validly consented to a search of his residence at the time of the search. A consent-to-search form was provided to Defendant by Officer Williams after he advised Defendant that he was investigating drug complaints and asked if he could search the house. (Tr. at 99). Defendant responded, "you can search the house, I'm on parole, I mean, I can't stop you from searching anyway." (Tr. at 99). Defendant, without objection, signed the consent-to-search form. (Tr. at 104). Officer Williams testified that the search of the home did not start until after the Defendant signed the consent to search form. (Tr. at 99). The Consent to Search form demonstrates that the Defendant was advised he had a right to refuse consent but nonetheless signed it. (Exhibit 2 at 1). There is nothing in the record to suggest there were threats, coercion, or duress of any kind when the Defendant was asked to give consent to search the home. Thus,

9

considering the totality of the circumstances, there is nothing to suggest that the Defendant's consent to search was not knowingly and voluntarily given.

Accordingly, the Court recommends that the search of the Defendant's home was reasonable and did not violate his Fourth Amendment rights against unreasonable searches and seizures.

### D. Suppression of the Evidence as Fruits of the Poisonous Tree

Finally, Defendant argues that the physical evidence found should be suppressed under the fruit-of-the-poisonous-tree doctrine. (Def's Mot. to Suppress at 11). When an illegal search or seizure results in the production of incriminating evidence, all such evidence resulting from the search or seizure should be excluded as "fruit of the poisonous tree." Wong Sun v. United States, 371 U.S. 471, 488 (1963). As the Court recommends that none of the Defendant's Fourth Amendment rights have been violated, the Court finds that there is no illegality to be addressed under the fruit-of-the-poisonous tree doctrine.

## III. Conclusion

For the reasons stated herein, the Court RECOMMENDS that the Defendant's Motion to Suppress be DENIED.

Signed this 30th day of March, 2012.

> s/ Charmiane G. Claxton
> CHARMIANE G. CLAXTON
> UNITED STATES MAGISTRATE JUDGE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**